**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

APM TERMINALS PACIFIC, LLC, a corporation, and APM TERMINALS NORTH AMERICA, INC., a corporation,

    Petitioners,

v.

DONALD GUILFORD,

    Respondent.

Case No. 2:24-cv-11003 (BRM) (MAH)

**OPINION**

**MARTINOTTI, DISTRICT JUDGE**

    Before the Court is Petitioners APM Terminals Pacific, LLC ("APMTP") and APM Terminals North America, Inc's ("APMTNA") (collectively, "APM") Motion to Compel Arbitration ("Motion") (ECF No. 7)[1] pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq*. ("FAA"), of the claims contained in Respondent Donald Guilford's ("Guilford") First Amended Complaint (ECF No. 1-6). Guilford filed an opposition to the Motion (ECF No. 10), and APM replied (ECF No. 14)[2]. Guilford filed a sur-reply. (ECF No. 20.) Having reviewed and considered the submissions filed in connection with the Motion and having declined to hold oral argument

---

[1] APM initiated this proceeding with a petition to compel arbitration under 9 U.S.C. § 4 and filed the memorandum of law in support as an exhibit. (*See* ECF No. 1-3.) Although APM filed the Motion which the Court addresses here (*see* ECF No. 7) in response to a text order (*see* ECF No. 5), the Court will consider, and therefore primarily cite to, APM's moving arguments as advanced in APM's memorandum of law and not the Motion, as it serves only to give notice and does not present arguments.

[2] APM initially filed a reply brief on January 27, 2025 (ECF No. 12), and soon thereafter refiled (ECF No. 14) to correct erroneous pagination.

pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause having been shown, APM's Motion to Compel Arbitration (ECF No. 7) is **DENIED**.

I. **BACKGROUND**

    **A. Procedural History**

This action has had a tortured procedural history through various courts at the state and federal levels in California and New Jersey. It began on May 1, 2024, when Guilford brought suit in the Superior Court of the State of California, County of Los Angeles ("Los Angeles Superior Court"), against Defendants. (No. 24STCV10894, ECF No. 1.) On June 24, 2024, APM removed the action to U.S. District Court for the Central District of California (the "Removal Docket"). (No. 2:24-05307, ECF No. 1.) Guilford filed a First Amended Complaint in the Removal Docket on August 13, 2024. (*Id.*, ECF No. 15.) On August 26, 2024, Guilford moved to remand the case to Los Angeles Superior Court. (*Id.*, ECF No. 21.) APMTP moved to dismiss the First Amended Complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) ("APMTP Motion to Dismiss") (*id.*, ECF No. 23), and filed an opposition to Guilford's remand motion on August 30, 2024 (*id.*, ECF No. 25). On the same day, APMTNA, APMTP, and Ortiz filed a joint motion to dismiss ("Joint Motion to Dismiss") for failure to state a claim on which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). (*Id.*, ECF No. 24.) Guilford filed a reply brief in further support of his remand motion on September 12, 2024. (*Id.*, ECF No. 29.) The next day, on September 13, 2024, Guilford filed both an opposition to the Joint Motion to Dismiss (*id.*, ECF No. 31) as well as an opposition to the APMTP Motion to Dismiss (*id.*, ECF No. 32).

On September 16, 2024, APMTP filed an *ex parte* application for an order either striking Guilford's opposition briefs as untimely, dismissing the First Amended Complaint under Federal

2

Rules of Civil Procedure 12(b)(2) or (6), or granting the Defendants an extension to file reply papers in support of their various motions. (*Id.*, ECF No. 33.) Guilford opposed (*id.*, ECF No. 34), and APMTP replied (*id.*, ECF No. 36). The U.S. District Court for the Central District of California granted APMTP's request for an extension (*id.*, ECF No. 35), giving Defendants until September 20, 2024, to file their reply papers, which they did (*id.*, ECF Nos. 36, 38.) At a hearing held on September 30, 2024, the U.S. District Court for the Central District of California granted Guilford's motion to remand the case to Los Angeles Superior Court and denied all other motions as moot. (*Id.*, ECF No. 41.)

On December 9, 2024, APM filed the verified petition to compel arbitration, along with a memorandum of law in support, as an original proceeding in this Court[3] under 9 U.S.C. § 4. (ECF Nos. 1, 1-3.) Following an order asking APM to file a formal notice to compel arbitration as well as a certificate of service indicating Guilford has been properly served (ECF No. 5), APM filed the Motion to Compel Arbitration on December 17, 2024 (ECF No. 7). Guilford opposed on January 21, 2025 (ECF No. 10), and APM replied on January 28, 2025 (ECF No. 14). Guilford filed a sur-reply (ECF No. 20) after receiving permission from the Court (ECF No. 19).

**B. Factual Background**

This action stems from an employment dispute filed by Guilford against APMTP, APMTNA, Janee Ortiz ("Ortiz"), Marty Yarnall ("Yarnall"), and Does 1–100 in the Central District of California involving allegations of violations of the California Fair Employment and

---

[3] APM's position regarding the Motion stems from its belief in the applicability of a pre-existing agreement between the parties which contains an arbitration provision. *See supra*. That arbitration provision provides, in relevant part, arbitrable disputes "must be submitted to and resolved only through final and binding arbitration in New Jersey . . . and in accordance with the Federal Rules of Civil Procedure and the Federal Rules of Evidence." *See supra* Section III (quoting ECF No. 1-3 at 5).

Housing Act ("FEHA"), Cal. Gov't Code § 12940, *et seq.*, wrongful termination in violation of public policy, violation of California Labor Code § 1102.5, and false promise and/or intentional misrepresentation. (ECF No. 1-6 ¶ 1.) In the First Amended Complaint, Guilford generally alleges he worked for APM for a period of time, left the company, and then re-joined APM as an operations manager at a location in the port of Los Angeles, California in July 2018, and was terminated in the spring of 2023 following years of race- and disability-based discrimination, harassment, and retaliation. (*Id.* ¶¶ 10–33.) APM's position with respect to the Motion, *see infra* Section III, is situated around an arbitration provision ("Provision"), governed by the FAA, contained in a separation agreement ("2014 Agreement") that ended Guilford's first period of employment that began on or about December 5, 2014. (ECF No. 1-3 at 3–6.)

      Guilford is a Black male who suffers from several medical conditions, including polycystic kidney disease, end stage renal disease (stage 5), and sleep apnea, that require an interactive process and/or reasonable accommodation under FEHA. (ECF No. 1-6 ¶¶ 4, 24.) The First Amended Complaint describes APM as his former employer. (*Id.* ¶ 5.) According to APM's verified petition to compel arbitration under 9 U.S.C. § 4, APMTNA is a container terminal operating company incorporated in Delaware and in North Carolina that designs, builds, and operates ports and terminal facilities throughout North America (ECF No. 1-3 ¶ 1.) APMTP is a subsidiary of APMTNA. (*Id.* ¶ 2.) Defendants Ortiz, an APM employee with whom Guilford interviewed for the operations manager role, Yarnall, Chief Operations Officer and Senior Director of Operations, and Does 1–100 all reside in California and are being sued in their individual capacities as agents of APM and as corporate or other business entities to the extent relevant. (ECF No. 1-6 ¶¶ 6–8.)

In July 2018, when Guilford re-joined APM as an operations manager, he received assurances from Ortiz that APM "is an affirmative action employer, provides full opportunity for advancement regardless of race and/or disability/perceived disability and otherwise does not discriminate in violation of [FEHA]." (*Id.* ¶ 10.) Guilford was also assured by Yarnall that professional development opportunities and advanced educational programs would be made available. (*Id.* ¶ 13–14.) Guilford allegedly relied on these promises in deciding to accept the position with APM and move to California. (*Id.* ¶ 12.) APM allegedly suffers from a "severe underrepresentation of Black employees, especially in the managerial and executive ranks." (*Id.* ¶ 15.) Throughout his time at the company, Guilford applied but was "routinely rejected" for promotions while other non-Black employees hired around the same time as Guilford and who possessed fewer professional qualifications were "all subsequently promoted to director positions or at least to level 5 positions." (*Id.* ¶ 18.)

In 2019, Guilford suffered a near-fatal work injury, as well as the "jeer[s] and laugh[s]" of non-Black colleagues, who were allegedly "permitted" by APM to replay a video of the accident. (*Id.* ¶ 21.) Beginning in January 2022, Guilford was unexpectedly reassigned to cover the night shift, consisting of 12- to 14-hour shifts, without any rotations to the day shift (allegedly APM's routine practice "for fairness among the employees"), and was the only manager not provided a laptop for work. (*Id.* ¶¶ 22–23.) In March 2023, Guilford fell "very ill, was hospitalized and placed on medical leave for one week," allegedly from the long hours on the night shift and excessive stress of the job. (*Id.* ¶ 25.) Guilford's doctor allegedly requested APM make certain accommodations for him, including that Guilford be switched to the day shift to allow for dialysis treatment at night and be allowed to take lunch breaks at designated times. (*Id.* ¶ 26.) APM allegedly did not grant these requests, repeatedly demanded Guilford disclose his medical

conditions, and generally treated Guilford in what he describes as "a harsh and callous manner[.]" (*Id.* ¶¶ 26–28.) Guilford later took additional leave. (*Id.* ¶ 29.) In the spring of 2023, during the same period when Guilford applied and was rejected for a promotion for a third time, APM demanded Guilford either disclose his medical record or be terminated. (*Id.* ¶ 31.) Some time later, after Guilford returned from another period of leave, APM Chief Operating Officer Stephen Brown and Senior Human Resources Director Juan Iglesias asked Guilford "if he had threatened his supervisors the day before" and instructed him "to leave the premises immediately," despite his insistence he had not threatened anyone. (*Id.* ¶ 32.) Several days later, Guilford received an email informing him of his termination and separation from APM, which resulted in the immediate termination of the health insurance on which he relied for various medical treatments. (*Id.* ¶ 33.)

Guilford brought this action in California state court alleging the following causes of action against the various Defendants: (1) violations of FEHA, Cal. Gov't Code §§ 12940(a), (j), (h), (m), (n), and (k) for discrimination, harassment, and retaliation on the basis of race, age, disability or perceived disability, failure to accommodate, and failure to engage in interactive process, failure to investigate, prevent, and/or correct FEHA violations (*id.* ¶¶ 34–77); (2) wrongful termination in violation of public policy (*id.* ¶¶ 78–83); (3) violation of California Labor Code § 1102.5 (*id.* ¶¶ 84–91); and (4) false promise/intentional misrepresentation (*id.* ¶¶ 92–100).[4] Guilford seeks the following relief: (1) statutory, compensatory, general and punitive damages; (2) penalties, interest,

---

[4] Guilford lists "injunctive relief" as his tenth cause of action. (ECF No. 1-6 ¶¶ 101–02.) The Court does not include it here because injunctive relief is a remedy and not a cause of action. *See, e.g.*, *Pemberton v. Nationstar Mortg. LLC*, 331 F. Supp. 3d 1018, 1064 (S.D. Cal. 2018) ("Injunctive relief, like damages, is a remedy requested by the parties, not a separate cause of action." (internal citation omitted); *In re Shop-Vac Mktg. and Sales Pracs. Litig.*, 964 F. Supp. 2d 355, 365–66 (M.D. Pa. 2013) ("[I]njunctive relief is a remedy, not an independent cause of action.").

and other available remedies under FEHA; (3) prejudgment interest; (4) costs and fees; (5) injunctive relief; and (6) such further relief the Court deems just and proper. (*Id.* ¶¶ 1–9[5].)

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, "establishes a policy in favor of arbitration that requires the liberal reading of arbitration agreements and the resolution of any doubts in favor of arbitration." *S. Broward Hosp. Dist. v. Medquist, Inc.*, 258 F. App'x 466, 467 (3d Cir. 2007) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, (1983)). The FAA provides: "[a] written provision . . . to settle by arbitration a controversy . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]" 9 U.S.C. § 2. "Decades ago, the Supreme Court discussed 9 U.S.C. § 2 as 'a congressional declaration of a liberal federal policy favoring arbitration agreements.'" *White v. Samsung Elecs. Am., Inc.*, 61 F.4th 334, 338 (3d Cir. 2023) (quoting *Moses*, 460 U.S. at 24). More recently, though, the Supreme Court explained that "the FAA's 'policy favoring arbitration' does not authorize federal courts to invent special, arbitration-preferring procedural rules." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) (quoting *Moses*, 460 U.S. at 24). Rather, this policy "is to make 'arbitration agreements as enforceable as other contracts, but not more so.'" *Morgan*, 596 U.S. at 418 (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967)). "Accordingly, a court must hold a party to its arbitration contract just as the court would to any other kind." *Morgan*, 596 U.S. at 418.

When addressing a motion to compel arbitration, a federal court is "limited to a 'narrow scope' of inquiry." *Gay v. CreditInform,* 511 F.3d 369, 386 (3d Cir. 2007) (quoting *Great W.*

---

[5] The Court notes the First Amended Complaint restarts the numbering of the paragraphs in its prayer for relief without explanation. (*See generally* ECF No. 1-6.) The Court preserves that numbering choice here.

*Mortg. Corp. v. Peacock,* 110 F.3d 222, 228 (3d Cir. 1997)); *MZM Constr. Co., Inc. v. New Jersey Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 399 (3d Cir. 2020). The Court may consider only narrow "gateway matters" that touch on the question of arbitrability, such as whether an arbitration agreement applies to a particular controversy, or whether the parties are bound by the arbitration clause. *Certain Underwriters at Lloyd's London v. Westchester Fire Ins. Co.*, 489 F.3d 580, 585 (3d Cir. 2007).

"[Q]uestions of arbitrability, including challenges to an arbitration agreement's validity, are presumed to be questions for judicial determination." *Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citation omitted). "In considering a motion to compel arbitration, a court must engage in a two-step analysis: it must determine first whether there is a valid agreement to arbitrate and, if so, whether the specific dispute falls within the scope of said agreement." *Thomas v. Jenny Craig, Inc.*, Civ. A. No. 10-02287, 2010 WL 3076861, at * 3 (D.N.J. Aug. 4, 2010) (citing *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 523 (3d Cir. 2009); *Salvadori v. Option One Mortg. Corp.*, 420 F. Supp. 2d 349, 356 (D.N.J. 2006)). "State contract principles apply in ascertaining whether the parties to an action have agreed to arbitrate." *Sarbak v. Citigroup Glob. Mkts., Inc.*, 354 F. Supp. 2d 531, 537 (D.N.J. 2004) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002)). "Under New Jersey law, '[a]n agreement to arbitrate, like any other contract, must be the product of mutual assent, as determined under customary principles of contract law.'" *Levy v. AT&T Servs., Inc.*, Civ. A. No. 21-11758, 2022 WL 844440, at *3 (D.N.J. Mar. 22, 2022) (alteration in original) (quoting *James v. Glob. TelLink Corp.*, 852 F.3d 262, 265 (3d Cir. 2017)). "Therefore, 'if parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract.'" *Id.* (quoting *Crawford v.*

8

*Compass Grp. USA*, Civ. A. No. 14-02545, 2015 WL 1006389, at *3 (D.N.J. Mar. 6, 2015)). "To manifest assent, 'an offeree must provide "unqualified acceptance," which can be express or implied by conduct.'" *Id.* (quoting *Glob. TelLink Corp*, 852 F.3d at 265). For example, where employees are properly notified of an arbitration agreement, and where inaction may lawfully be considered assent, "failure to opt out of the arbitration through inaction [is] a proper method to assent." *Id.* at *4 (collecting cases).

"Where arbitrability is apparent on the face of the complaint, a Rule 12(b)(6) standard of review should be applied to the motion to compel arbitration." *Sauberman v. Avis Rent a Car Sys., L.L.C.*, Civ. A. No. 17-00756, 2017 WL 2312359, at *2 (D.N.J. May 26, 2017) (citing *Guidotti*, 716 F.3d at 774). However, the "Rule 12(b)(6) standard is inappropriate when either 'the motion to compel arbitration does not have as its predicate a complaint with the requisite clarity' to establish on its face that the parties agreed to arbitrate" or when "the opposing party has come forth with reliable evidence that is more than a 'naked assertion . . . that it did not intend to be bound' by the arbitration agreement, even though on the face of the pleadings it appears that it did." *Guidotti*, 716 F.3d at 774. Rather, courts should use the Federal Rule of Civil Procedure 56 summary judgment standard. *Id.* "Therefore, a court must first determine whether there is a genuine issue of material fact as to whether a valid arbitration agreement exists." *Jayasundera v. Macy's Logistics & Operations, Dep't of Hum. Res.*, No. 14-CV-7455, 2015 WL 4623508, at *2 (D.N.J. Aug. 3, 2015). In making this determination, the party opposing arbitration receives "the benefit of all reasonable doubts and inferences that may arise." *Id.*

### III. DECISION

APM's argument centers on the 2014 Agreement and Provision, governed by the FAA, to which APM argues Guilford is still bound. (ECF No. 1-3 at 3–6.) APM contends the FAA

9

represents a strong public policy in favor of arbitration agreements, which "leaves no place for the exercise of discretion[,]" and requires Guilford to show his claims "are unsuitable for arbitration." (*Id.* at 8–9.) Moreover, APM claims Guilford agreed to be bound by the Provision by affirmatively acknowledging and signing the 2014 Agreement, and that the Provision covers "any claim that Guilford is presently pursuing or could pursue against Petitioners." (*Id.* at 13–17.) APM argues, provided the Court grants its motion to compel arbitration, the action should be stayed pending arbitration of the claims, and further that it should be granted attorneys' fees "in light of Guilford's refusal to proceed with arbitration as agreed." (*Id.* at 18–19.)

In his opposition brief, Guilford argues APM's reliance on the 2014 Agreement and Provision is misleading because "the subsequent 2018 employment agreement . . . , which lacks an arbitration provision [] contains an integration clause explicitly superseding all prior agreements." (ECF No. 10 at 5–6.) Guilford suggests he raised the relevance of the 2018 employment agreement ("2018 Agreement") to APM when the parties met and conferred, and that APM's omission of the 2018 Agreement violates its duty of candor to the Court. (*Id.* at 6.) Guilford further contends that, even if not superseded, the limited scope and purpose of the 2014 Agreement shows it was intended to apply only to the prior employment relationship between the parties, which ended in 2015. (*Id.* at 6–9.) Moreover, Guilford argues the Provision is procedurally and substantively unconscionable, unduly burdensome, and fundamentally unfair, and would violate California's strong public policy protections for workers. (*Id.* at 9–14.) Finally, Guilford contends APM waived any right to arbitrate because it delayed bringing the Motion by seven months, during

10

which time it actively litigated in other fora, prejudicing Guilford by forcing him to expend considerable time and resources in litigating in both state and federal court. (*Id.* at 15–17.)

APM replies Guilford failed to dispute several material issues, including that he signed and agreed to be bound by the 2014 Agreement. (ECF No. 14 at 1.) It also notes Guilford erroneously relies on California law whereas, under the choice of law provision of the 2014 Agreement, New Jersey law must be applied, and Guilford does not show any relevant exceptions apply. (*Id.* at 1–4.) Even under California law, APM argues Guilford must submit to arbitration because the 2018 Agreement does not supersede the 2014 Agreement on the grounds that the two agreements are not executed by the same parties and do not cover the same subject matter. (*Id.* at 4–6.) Further, although APM states the 2018 Agreement provides it "'will be the entire agreement' between Guilford and APM," (*id.* at 5 (citing ECF No. 10-2 ("Guilford Declaration") ¶ 9)), it claims the 2018 Agreement "cannot be interpreted to 'waive, extinguish, excuse, or release' Guilford's obligation to arbitrate under the [2014] Agreement," (*id.* at 6 (quoting *Oxford Preparatory Acad. v. Edlighten Learning Sols.*, 34 Cal. App. 5th 605, 611 (2019))). In APM's assessment, the Provision broadly covers all disputes arising between Guilford and any "Company Releasees," *see infra*, and is not unconscionable or in conflict with public policy protections, and APM did not waive its right to arbitration. (*Id.* at 7–14.)

In his sur-reply, Guilford reiterates his position that the 2018 Agreement superseded the 2014 Agreement, and its Provision to arbitrate, which was not "intended to bind Respondent beyond the context of his termination[.]" (ECF No. 20 at 1.) Guilford insists the 2018 Agreement could have included an arbitration provision and claims the absence of one underscores the parties' intent not to be so bound. (*Id.* at 2.) He also replies APM's arguments concerning choice of law and public policy are irrelevant to the threshold issue of whether an enforceable agreement to

11

arbitrate exists and insists APM provides no "sound legal reasoning" to support its arguments. (*Id.* at 2–3.)

Under the FAA, agreements to arbitrate are "valid, irrevocable, and enforceable," subject to traditional contract principles. 9 U.S.C. § 2; *see also CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (citations omitted) (explaining the FAA favors arbitration agreements and "requires courts to enforce agreements to arbitrate according to their terms"). The FAA provides that contract provisions manifesting the intent of the parties to settle disputes in an arbitration shall be binding, allows for the stay of federal court proceedings in any matter referable to arbitration, and permits both federal and state courts to compel arbitration if one party has failed to comply with an agreement to arbitrate. 9 U.S.C. §§ 2–4.

Basic contract principles provide an agreement may be superseded by a subsequent agreement on the same subject matter. *See, e.g.*, *Jaludi v. Citigroup*, 933 F.3d 246, 256 (2019). Likewise, "an arbitration clause may be modified or superseded." *Pearson v. Valeant Pharms. Int'l, Inc.*, Civ. A. No. 17-1995, 2017 WL 6508358, at * 4 (D.N.J. Dec. 20, 2017) (quoting *Wein v. Morris*, 944 A.2d 642, 648 (N.J. 2008)). Courts have found an arbitration provision in a prior agreement is superseded by a later agreement without an arbitration provision if the subsequent agreement contains an unambiguous complete integration or merger clause. *Symrise, Inc. v. Kennison*, Civ. A. No. 22-7299, 2024 WL 3665805, at *7 (D.N.J. Aug. 6, 2024) (citing *Rezac v. JMK Auto Sales, Inc.*, A-0931-11T1, 2013 WL 1907739, at *4 (N.J. Super. Ct. App. Div. May 9, 2013); *AllianceBernstein Invs., Inc. v. Eschert*, Dkt. No. A-5420-09T4, 2011 WL 1345026, at *6 (N.J. Super. Ct. App. Div. Apr. 11, 2011)). An integration or merger clause is "one which provides in substance that the instrument contains all the terms and conditions agreed on by the parties, and

12

that no other agreements, oral, or otherwise will be deemed to exist or to bind any of the parties." N.J. Forms Legal and Bus. § 10:31.

As a preliminary matter, because arbitrability is not apparent on the face of the Complaint, the Court applies the Federal Rule of Civil Procedure 56 summary judgment standard of review, *Guidotti*, 716 F.3d at 774, and focuses its inquiry on any genuine disputes of material fact regarding the existence and validity of an arbitration agreement between the parties, *Jayasundera*, 2015 WL 4623508, at *2.

Here, following the two-step analysis for motions to compel arbitration in the Third Circuit, the Court finds, at the first step, there is no valid agreement to arbitrate. The parties do not dispute the 2014 Agreement, and by the extension the Provision concerning arbitration of disputes therein, was validly executed. (ECF Nos. 1-3 at 3–6, 10–12; 10 at 5–9.) Instead, they disagree whether and to what extent the 2014 Agreement was superseded by the 2018 Agreement. (ECF Nos. 12 at 4–6; 10 at 5–6.) Guilford insists the 2014 Agreement is inapplicable to this action because it was expressly superseded by the integration clause in 2018 Agreement. (ECF No. 10 at 5–6). Notably, APM expressly concedes the 2018 Agreement specifically provided it represented the entire agreement between the parties and do not attempt to argue the 2018 Agreement contains its own arbitration provision. (ECF No. 14 at 5 (citing ECF No. 10-2 ("Guilford Declaration") ¶ 9).)

In relevant part, the Provision provides:

> any dispute (an "Arbitrable Dispute") now or hereafter arising between you and any of the Company Releasees, including but not limited to any concerning the formation, validity, interpretation, effect or alleged violations of this Agreement, the arbitrability of any dispute, any federal, state or location statutory claim (including discrimination, retaliation and wage and hour statutes), contract claims, tort claims, and claims of any sort, will and must be submitted to and resolved only through final and binding arbitration

> in New Jersey . . . and in accordance with the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

(ECF No. 1-3 at 5.) "Company Releasees" is defined in paragraph 3(c) of the 2014 Agreement as follows:

> The term "Company Releasees" means the Company and its affiliates, including but not limited to all of the Company's parents, subsidiaries, related companies, partnerships and joint ventures (*including APM* . . . ), predecessors, and successors, . . . .

(*Id.* (emphasis added).) Guilford does not dispute the above language, but instead attaches to his opposition brief a sworn declaration in which he references key provisions of the 2018 Agreement, including a clause that states:

> This offer letter, together with the Confidentiality and Proprietary Rights Agreement, *will be the entire agreement relating to your employment with the Company*. You acknowledge that in deciding to sign this offer letter, you have not relied on any representations, promises, or commitments concerning your employment, whether spoken or in writing, made to you by any APM Terminals representative, except for what is expressly stated in this offer letter.

(ECF No. 10-2 ¶ 9 (emphasis added).)

The Court finds there is no dispute the plain language of the 2018 Agreement between APM and Guilford, executed on May 21, 2018, represents the complete and "entire agreement" between them, and therefore supersedes all other promises or agreements, including the 2014 Agreement and Provision. (*Id.*) *See Symrise*, 2024 WL 3665805, at *7 ("[W]hen 'language of a contract is plain and capable of legal construction, the language alone must determine the agreement's force and effect.'" (citation omitted)). APM concedes the language from the 2018 Agreement provided in Guilford's declaration is accurate and represents the entire agreement of the parties, specifically excluding any prior promises or commitments. (*Id.*; ECF No. 14 at 5). Even absent APM's concession, the Court would reach the same result because paragraph 3(c) of

the 2014 Agreement clearly defines APM as one of the "Company Releasees," as it is included amongst the Company's "parents, subsidiaries, related companies, partnerships and joint ventures." (ECF No. 1-3 at 5.) Therefore, because APM is an expressly included party to both the 2014 and 2018 Agreements, and both relate to the employment relationship between the parties and thus concern the same subject matter, the Court finds the prior 2014 Agreement was superseded by the subsequent 2018 Agreement. *See Jaludi*, 933 F.3d at 256; *Pearson*, 2017 WL 6508358, at *4 (citing *Kant v. Seton Hall Univ.*, No. 03-6135, 2008 WL 65159, at *7 (D.N.J. Jan. 4, 2008) (explaining New Jersey contract law generally provides a subsequent contract supersedes a prior agreement "covering the same subject matter and made by the same parties")).

Because the 2014 Agreement, and by extension the agreement to arbitrate contained in the Provision, was superseded by the 2018 Agreement (ECF No. 14 at 5), there was no mutual assent between the parties to subject these or any other claims to arbitration. The Court therefore cannot order arbitration and need not address the parties' remaining arguments.

Accordingly, APM's Motion to Compel Arbitration (ECF No. 7) is **DENIED**.

### IV.   CONCLUSION

For the reasons set forth above, and for good cause having been shown, APM's Motion to Compel Arbitration (ECF No. 7) is **DENIED**. An appropriate order follows.

Dated:  June 17, 2025                              */s/ Brian R. Martinotti*
                                                   **HON. BRIAN R. MARTINOTTI**
                                                   **UNITED STATES DISTRICT JUDGE**

15